UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LACOTE, LLC | CIVIL ACTION |
| VERSUS | NO: 09-6384 |
| GLOBAL GOLF CONSTRUCTION, INC. & BOTTOM LINE EQUIPMENT, LLC | SECTION: "A" (2) |

**ORDER AND REASONS**

Before the Court is a **Motion to Remand (Rec. Doc. 7)** filed by plaintiff LaCote, LLC. Defendant Global Golf Construction, Inc. opposes the motion. The motion, set for hearing on October 28, 2009, is before the Court on the briefs without oral argument.[1] For the reasons that follow, the motion is DENIED.

**I. BACKGROUND**

On or about October 25, 2006, plaintiff LaCote, LLC and defendant Global Golf Construction, Inc. entered into an agreement for the construction of the LaTour Golf Course which was to be constructed in Matthews, Louisiana. (Pet. ¶ IV). Work on the project began in November 2006, and LaCote made regular payments in accordance with the terms of the contract, said payments totaling $9,540,649.57. (Pet. ¶¶ V & VI).

---

[1] Oral argument has been requested but the Court is not persuaded that oral argument would be helpful in light of the specific legal issues presented.

1

LaCote alleges in this lawsuit that Global Golf was not a licensed contractor as required by Louisiana law, La. R.S. § 37:2150, et seq., rendering the construction contract absolutely null. (Pet. ¶¶ VII-IX). LaCote seeks judgment in the amount of all payments made to Global Golf that exceed Global Golf's direct expenses incurred for the project. (Pet. ¶ XVII).

LaCote has also asserted claims against Bottom Line Equipment, LLC, a local company, which Global Golf hired to provide certain equipment and/or services in furtherance of the construction project. In March 2009, Bottom Line advised LaCote of its intent to place a construction lien on the property unless LaCote paid $6,180.63 owed for rental machines. (Pet. ¶ XI). LaCote paid the demanded funds to Bottom Line in order to avoid having a lien filed against its property. (Pet. ¶ XIII). Under a theory of unjust enrichment, LaCote seeks the return of all funds paid to Bottom Line contending that the nullity of the LaCote/Global Golf contract likewise nullified the Global Golf/Bottom Line contract--which means that Bottom Line never had the right to file a construction lien against the property. (Pet. ¶ XVI). Alternatively, LaCote seeks to recover all payments made to Bottom Line that exceed its direct expenses incurred for the project. (Pet. ¶ XVII).

LaCote originally filed this suit in state court. Global

Golf removed the case to this Court contending that the Court has diversity jurisdiction over LaCote's claim against Global Golf and that LaCote improperly joined Bottom Line to defeat jurisdiction in federal court. (Rec. Doc. 1). LaCote now moves to remand the case to state court arguing that it has stated a valid cause of action against Bottom Line under state law. LaCote seeks attorney's fees and costs in conjunction with this motion.

**II. DISCUSSION**

To remove a case based on diversity jurisdiction, the removing defendant must demonstrate that all of the prerequisites of diversity jurisdiction contained in 28 U.S.C. § 1332 are satisfied. Smallwood v. Illinois Cent. R.R., 385 F.3d 568, 572 (5th Cir. 2004) (en banc). The doctrine of improper joinder recognizes that a federal court should not sanction devices intended to prevent removal where the defendant would otherwise have that right pursuant to statute. See id. (quoting Charles Alan Wright, Fed. Prac. & Pro. § 3641, at 173 (3d ed. 1998)). Thus, a case lacking complete diversity may be removable where the removing defendant establishes that the plaintiff has joined a non-diverse defendant solely for the purpose of defeating federal jurisdiction.

It is important to note, however, that the plaintiff's

motive or purpose in joining the non-diverse defendant is not relevant to the improper joinder inquiry. Smallwood, 385 F.3d at 574. Rather, the Court's sole inquiry is the inability of the plaintiff to establish a cause of action against the non-diverse defendant in state court.[2] Id. (quoting Travis v. Irby, 326 F.3d 644, 646-47 (5th Cir. 2003)). The test turns on whether there is no possibility of recovery by the plaintiff against the non-diverse defendant, "which stated differently means that there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against an in-state defendant." Smallwood, 385 F.2d at 573. In making this determination the court may conduct a Rule 12(b)(6)-type analysis, testing the allegations of the complaint to determine whether the complaint states a claim against the non-diverse defendant under state law. Id. And there is generally no improper joinder if the plaintiff can survive a Rule 12(b)(6) challenge. Id. But the court may, in its discretion, "pierce the pleadings and conduct a summary inquiry" where the court is convinced that the plaintiff has misstated or omitted certain facts in his complaint that impact the improper joinder inquiry. Id.

---

[2] This circuit also recognizes actual fraud in the pleading of jurisdictional facts as a second method for establishing improper joinder but that method is not at issue in this case. Smallwood, 385 F.3d at 573.

The improper joinder analysis requires that the district court take into account all unchallenged factual allegations in the light most favorable to the plaintiff. Travis, 326 F.3d at 649 (citing Carrier v. Sears, Roebuck & Co., 893 F.2d 98, 100 (5th Cir. 1990); Griggs v. State Farm Lloyds, 181 F.2d 694, 699-702 (5th Cir. 1999)). Any contested issues of fact and any ambiguities of state law are to be resolved in the plaintiff's favor. Id. (citing Griggs, 181 F.2d at 699). The burden of persuasion on those who claim fraudulent joinder is a heavy one. Id. (citing B, Inc. v. Miller Brewing Co., 663 F.2d 545, 549 (5th Cir. 1981)).

LaCote's unjust enrichment claim against Bottom Line is based on the contention that the Global Golf/Bottom Line subcontract was an absolute nullity because any contract made by Global Golf, as a unlicensed contractor, was absolutely null. And because Bottom Line's contract was null, it had no right to seek payment directly from LaCote.

LaCote also contends that Bottom Line should have to return the money it received for its services because Bottom Line received a thing not owed.[3] LaCote contends that Bottom Line received a thing not owed because LaCote only paid Bottom Line

---

[3] "A person who has received a payment or a thing not owed to him is bound to restore it to the person from whom he received it." La. Civ. Code art. 2299.

5

after it threatened to file a lien--a remedy that Bottom Line never had because Bottom Line's contract with Global Golf was a nullity.

This case presents a straightforward application of the improper joinder doctrine. The application is straightforward in this case because it is based solely on the narrow *legal* question of whether Global Golf's alleged status as an unlicensed contractor either nullified Bottom Line's rights under its subcontract with Global Golf or eliminated Bottom Line's rights to file a lien under the Louisiana Private Works Act. Nothing in the petition suggests that Bottom Line's work was unacceptable or deficient in any manner, and LaCote's claims against Bottom Line are grounded solely on Global Golf's alleged status as an unlicensed contractor. Whether Global Golf was in fact a licensed contractor under Louisiana law is a merits-based question which the Court cannot resolve for purposes of the improper joinder analysis. The Court will assume for now that Global Golf was <u>not</u> a licensed contractor under Louisiana law because contested issues of fact are to be resolved in LaCote's favor.[4]

Two distinct statutory schemes are involved in this case.

---

[4] Global Golf's status is more appropriately described as a mixed question of fact and law, which is still appropriately construed in LaCote's favor for purposes of the improper joinder analysis.

The first statutory scheme is the Louisiana Private Works Act ("PWA"), located at La. R.S. § 9:4801, et seq. When an owner contracts for the improvement of an immovable with a contractor, the PWA grants the contractor's subcontractors a claim against the owner to secure payment of the price of work performed at the site of the immovable. La. Rev. Stat. Ann. § 9:4802(A)(1) (West 2007); First Thrift & Loan, LLC v. Griffin, 954 So. 2d 269, 271 (La. App. 2d Cir. 2007). The claims against the owner are secured by a privilege on the immovable on which the work is performed. Id. § 4802(B). The PWA creates a right against an owner in favor of a laborer, even though the laborer does not have a contractual relationship with the owner, by virtue of the worker filing a lien. Id. The legislative intent and fundamental aim of the PWA is to protect laborers and subcontractors who engage in construction and repair projects. First Thrift & Loan, 954 So. 2d at 271 (citing Hibernia Nat'l Bank v. Belleville Hist. Dev., LLC, 815 So. 2d 301 (La. App. 4th Cir. 2002)).

The second statutory scheme is part of Title 37, Professions and Occupations, Chapter 24 of which governs Contractors, located at La. R.S. § 37:2150, et seq. The statutory scheme enumerates strict requirements for the licensing of contractors, La. Rev. Stat. Ann. § 2156.1 (West Supp. 2009), and declares that it shall

be unlawful for any person to engage in the business of contracting in this state, or to act as a contractor, unless he holds an active license as a contractor under the provisions of Chapter 24. La. Rev. Stat. Ann. § 37:2160(A) (West 2007). Anyone who acts as a contractor without an appropriate license is guilty of a misdemeanor, and once convicted is subject to a fine and/or imprisonment. Id. § 37:2160(C). Further, the State Licensing Board for Contractors has the authority to impose civil penalties for those violating the licensing requirements. See La. Rev. Stat. Ann. § 37:2162 (West Supp. 2009).

Louisiana courts have recognized that section 37:2150, et seq. is a prohibitory law because it prohibits any person or entity from engaging in the business of contracting without having qualified as a contractor under the provisions of Chapter 24. Alonzo v. Chifici, 526 So. 2d 237, 243 (La. App. 5th Cir. 1988). As a prohibitory law the licensing provisions cannot be avoided by private agreement and any contracting agreement by the contractor is a nullity. Id. (citing La. Civ. Code art. 7; Hagberg v. John Bailey Contractor, 435 So. 2d 580, 587 (La. App. 3d Cir. 1983)). Because a contracting agreement by an unlicensed contractor is void as against public policy, an unlicensed contractor cannot recover the overhead and profit that might otherwise be a part of his contract. Hagberg v. John Bailey

Contractor, 435 So. 2d 580, 587 (La. App. 3d Cir. 1983); Alonzo v. Chifici, 526 So. 2d 237, 243-44 (La. App. 5th Cir. 1988). Therefore, in addition to the prescribed statutory punishments for those who engage in contracting without a license, an unlicensed contractor can only recover his actual costs of materials, services, and labor without any allowance for overhead and profits. Id. The purpose of the legislature in enacting Chapter 24 is the protection of the health, safety, and general welfare of all those persons dealing with persons engaged in the contracting vocation, and the affording of such persons of an effective and practical protection against the incompetent, inexperienced, unlawful, and fraudulent acts of contractors with whom they contract. La. Rev. Stat. Ann. § 37:2150 (West 2007). This legislative statement clearly establishes an umbrella of protection for the general public. Hagberg, 435 So. 2d at 584.

Chapter 24 of Title 37 communicates a clear public policy of punishing contractors who work in violation of the state's licensing requirements. As explained above, Louisiana courts have enforced that public policy by refusing to allow unlicensed contractors to profit from their unlawful acts, and in doing so it is widely recognized that their contracts are null. But there is no legal authority whatsoever for LaCote's assertion that an unlicensed contractor's "punishment" is also visited upon the

9

subcontractors that he hires for any given job.  All of the cases cited by LaCote in support of its motion to remand involve claims made by or against the unlicensed contractor himself--and those cases simply confirm that an unlicensed contractor cannot enforce his unlawful contract against the other parties to that contract. <u>See, e.g.</u>, <u>Hagberg</u>, 435 So. 2d at 587; <u>Alonzo</u>, 526 So. 2d at 243-44.  But those cases do not stand for the proposition that an unlicensed contractor loses the legal capacity to create other binding contracts, particularly those in which he hires a subcontractor to work on a project. And in no case has a subcontractor been deprived of the benefits of his work contract based on the unfortunate circumstance of being hired by a contractor who willingly violates the law.

The complete lack of any cases that impose guilt by association on a subcontractor is surely attributable to the fact that such a draconian outcome not only lacks support in Chapter 24 governing contractors, but also directly contravenes the protections that the legislature specifically grants to subcontractors in the PWA.  The penalties that flow from Chapter 24, both statutory and jurisprudential, are concerned with punishing those persons who violate the law.  Nothing in Chapter 24 suggests that a subcontractor hired by an unlicensed contractor is violating the law.  In fact, Chapter 24 is a

comprehensive body of law and the legislature could have easily imposed a duty on subcontractors to independently investigate the licensing status of the contractors who hire them.  But the legislature declined to do so.[5]  The express legislative intent behind Chapter 24 is to protect the public from unscrupulous contractors.  Punishing subcontractors who fail to police contractors, a duty which the law does not impose on them, is not consistent with the express purpose of Chapter 24.  Thus, Bottom Line's contract with Global Golf was not rendered null by Global Golf's status as an unlicensed contractor.

    Moreover, in addition to finding no support for LaCote's claim against Bottom Line in Chapter 24, LaCote's contention that Global Golf's status somehow affected Bottom Line's rights under the Louisiana PWA is incorrect.  The legislature enacted the PWA to protect laborers and subcontractors who engage in construction and repair projects.  The PWA specifically defines the term "contractor" and that definition makes no reference whatsoever to Title 37, Chapter 24.  See Rev. Stat. Ann. § 9:4807(A), (B) (West 2007).  In fact, the term "contractor" as used in the PWA is

---

[5] The difficulty in requiring a subcontractor to confirm the licensing status of the contractor who hires him would be complicated by the fact that the duty would be ongoing during the life of a project.  As Hagberg, supra, demonstrates, a contract that is lawful at its inception can become unlawful if the contractor loses his license during the course of the project.  Thus, a subcontractor would be required to constantly confirm the contractor's licensing status in order to protect his own rights.

clearly intended to be broad so as to provide labors and subcontractors with far reaching protection. In order to recognize LaCote's claim against Bottom Line the Court would have to use legislation created for one purpose, i.e., to protect the public by punishing unlawful contractors, to undermine the express protections that the legislature specifically granted to subcontractors in unrelated legislation, i.e., the PWA––this being done in the complete absence of any legal authority to support such a claim. And such an outcome would be wholly inconsistent with the express goal of the PWA, which is to protect subcontractors and laborers.

Because the Court is persuaded that Bottom Line's contract was not a nullity, and because the PWA does limit its application to lawfully licensed contractors, Bottom Line's right to file a lien pursuant to section 9:4802 were not affected by Global Golf's status. Thus, Bottom Line did not receive "a thing not owed" from LaCote.

In sum, LaCote has no claim against Bottom Line under Louisiana law based on Global Golf's alleged status as an unlicensed contractor. LaCote has no possibility of recovery against Bottom Line and there is no reasonable basis for the Court to predict that LaCote might be able to recover against Bottom Line. Global Golf has established that Bottom Line has

been improperly joined which means that Bottom Line's citizenship is to be ignored for citizenship purposes. Because the Court has diversity jurisdiction over the claims between LaCote and Global Golf, the motion to remand is denied.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion to Remand (Rec. Doc. 7)** filed by plaintiff LaCote, LLC. is **DENIED.**

November 9, 2009

```
                        _____
                              JAY C. ZAINEY
                        UNITED STATES DISTRICT JUDGE
```